John F. LE BUS, Regional Director of the Fifteenth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

LOCALS 406, 406 A, 406 B, and 406 C, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO, Respondents.

Civ. A. No. 6118.

United States District Court
E. D. Louisiana, New Orleans Division.
Oct. 5, 1956.

---

1. 15 U.S.C.A. §§ 77a–77aa.

2. 15 U.S.C.A. § 77l (1).

James F. Foley, Washington, D. C., for petitioner.

C. Paul Barker, Dodd, Hirsch & Barker, New Orleans, La., for respondents.

J. SKELLY WRIGHT, District Judge.

This proceeding is before the court on a petition filed by the Regional Director of the Fifteenth Region of the National Labor Relations Board seeking an injunction against respondents restraining them from engaging in secondary boycotts within the meaning of Section 8(b),

Subsection (4) (A) and (B), of the National Labor Relations Act, 29 U.S.C.A. § 158(b) (4) (A, B). The Act empowers the Board, upon the filing of appropriate charges, to issue, hear and determine complaints that employers or labor organizations have engaged in or are engaging in unfair labor practices within the meaning of the Act,[1] and, pending such proceedings before the Board, the proper officer of the Board is authorized[2] to petition any district court of the United States for injunctive relief wherever preliminary investigation by him of the charges provides reasonable cause to believe that the charges are true and that a complaint should issue. The court in such instance is not called upon to decide whether in fact the charge of unfair labor practices is true. Once petitioner has shown that there is reasonable cause to believe the charge is true, the temporary injunction should issue. The ultimate determination of the truth of the charge and the existence of a violation of the Act affecting commerce is reserved exclusively to the Board, subject to review by the appropriate Court of Appeals, pursuant to Section 10(e) and (f) of the Act.

The Regional Director of the Board, after investigation, concluded that there was reasonable cause to believe that respondents here have committed unfair labor practices affecting commerce and, therefore, seeks in these proceedings an injunction to restrain further commission of these practices until the question of their legality may be passed on in due course by the Board. He predicates his conclusion on the following facts.

Jahncke Service, Inc., a Louisiana corporation whose operations admittedly bring it within the purview of the National Labor Relations Act, is engaged in, among other things, the manufacture, sale and distribution of ready-mixed concrete, concrete pipe and concrete products. It maintains several locations in and about New Orleans, in addition to an

---

1. Section 10(a) (b) and (c), 29 U.S.C.A. § 160(a–c).

2. Section 10(l), 29 U.S.C.A. § 160(l).

office building, where its operations are conducted. The truck drivers and certain other employees of Jahncke are represented by Local 270 of Teamsters, AFL–CIO. The balance of Jahncke employees are nonunion. The attempt on the part of the defendants herein to organize the crane and dragline operators employed by Jahncke gives rise to these proceedings.

On August 30, 1956, pickets from Local 406 began following Jahncke trucks making deliveries of ready-mixed concrete to contractors at construction projects. While the placards carried by the pickets showed that the union's dispute was with Jahncke, the legend on the placard so indicating was in much smaller print than the large word "picket" which occupied the space across the top of the placard. The construction sites were picketed whenever a Jahncke truck came on the premises, the pickets standing sometimes in close proximity and sometimes as much as 600 feet away. In addition to the placard, the pickets also carried handbills which explained that the union's differences were with Jahncke and not with the contractor on the construction site. These handbills were available on request, the pickets generally making no effort otherwise to distribute them.

When the pickets arrived on the construction sites, the employees of the secondary employers refused on many, but not all, occasions to perform their duties while the Jahncke trucks were on the premises. The business agent of Local 406 sought to have the contractors refuse to handle Jahncke concrete. With reference to at least one contractor, where the request was unheeded, work stoppages followed whenever Jahncke trucks appeared thereafter. As a result of the picketing and other activities of the union, seven of the eight general contractors using Jahncke concrete ceased so

doing after picketing of the construction sites began.

Petitioner contends that, as a result of the picketing by respondents, Section 8 (b), Subsection (4) (A) and (B), of the Act have been violated in that the object of the picketing, which resulted in the concerted refusal of employees of secondary employers to perform the duties under their employment, was to force the secondary employers to cease using the products of Jahncke and to force Jahncke to recognize or bargain with respondents who have not been certified as representative of Jahncke's employees under the provisions of Section 9 of the Act, 29 U.S.C.A. § 159.

Respondents maintain that ambulatory picketing is lawful where it conforms to the criteria outlined in the Moore Dry Dock case.[3] They argue that where, as form to that criteria, damage to the business of the secondary employer resulting from the refusal of its employees to cross the picket line is incidental and subject to the right of the union to publicize its dispute with the primary employer.

Congress, in Section 8(b), Subsection (4) (A) and (B), while recognizing the right of labor organizations to bring pressure to bear on primary employers in labor disputes, has sought to shield neutral employees from damage resulting from labor disputes not their own. In these subsections of the Act, Congress has made it unlawful for a union to engage in or to encourage strikes or work stoppages among employees of neutral employers where the object thereof is to force the neutral employers to cease doing business with the struck employer. In attempting to implement the Congressional mandate, the National Labor Relations Board has sought in its decisions to outline the conditions under which picketing affecting secondary employers would be considered lawful. These conditions are outlined in Moore Dry Dock, supra.[4]

---

3. 92 N.L.R.B. 547.

4. These conditions are that the picketing disclose clearly that the dispute is with the primary employer only, that the picketing is limited to times when the dispute situs is on the neutral employer's prem-

 Recently the Board has sought to add an additional condition to be met before picketing on the premises of neutral employers would be approved. The new condition is that where the primary employer has a place of business at which its employees may be reached by the union's picketing and publication of its labor dispute, ambulatory picketing on or near the premises of neutral employers comes under the proscription of Subsection (4) (A) and (B).[5] In fact, the Board has finally held, and its representative here contends, that failure to comply with its new condition is a per se violation of the Act. In re Teamsters Local No. 659, 116 N.L.R.B. 65. The Board, instead of attempting to determine in each case, as required by these subsections of the Act, whether the object of the picketing of the secondary employer is to persuade it, through strikes of its employees, not to do business with the primary employer, has sought a formula which may be used as a guide in making this determination. Unfortunately, no formula or other mechanical means can produce the right answer in every case. It is " 'the *objective* of the unions' secondary activities * * * and not the *quality of the means* employed to accomplish that objective, which was the dominant factor motivating Congress in enacting that provision.' " International Brotherhood of Electrical Workers, Local 501, A. F. of L. v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 959, 95 L.Ed. 1299. All the facts of each case must be studied in order to determine the legality of the union's secondary activities. No one fact can be necessarily conclusive. Sales Drivers, etc. v. National Labor Relations Board, 97 U.S.App.D.C. 173, 229 F.2d 514; National Labor Relations Board v. General Drivers, etc., 5 Cir., 225 F.2d 205.

██ Without attempting to analyze the various cases which have been written on this subject, it may be well to state some of the principles which seem to be evolving therefrom. Ambulatory picketing as such is not proscribed by the Act.[6] There is nothing in the Act which limits the right of the union by picketing or otherwise to express and publicize its grievances with the employer at any place where a sympathetic audience may be found. The union may not, however, punish neutral employers by strikes and other concerted action in an effort to bring pressure to bear on the primary employer.[7]

██ No serious problem arises where all of the employees of the struck employer perform their entire day's work at that employer's plant. Complications do arise, however, where some of such employees are required to perform their services at a common situs with employees of neutral employers. Apparently, if these employees working at the common situs are not available at the primary employer's plant, at least some portion of their working day, ambulatory picketing at the common situs is legal in spite of the fact that employees of neutral employers at the common situs may refuse to cross the picket line. National Labor Relations Board v. Local Union No. 55, 108 N.L.R.B. 363, 364–366, enforced 10 Cir., 218 F.2d 226; National Labor Relations Board v. Chauffeurs, Teamsters, etc., 106 N.L.R.B. 629, 632–639, enforced 7 Cir., 212 F.2d 216.

---

ises, that the primary employer is engaged in its normal business at the common situs when the picketing takes place, and that the picketing is confined to areas reasonably close to the situs of the dispute.

5. Washington Coca-Cola Bottling Works, Inc., v. National Labor Relations Board, 107 N.L.R.B. 299, 303, affirmed Brewery and Beverage Drivers and Workers Local Union No. 67 v. N. L. R. B., 95 U.S.App. D.C. 117, 220 F.2d 380; Southwestern Motor Transport, 115 N.L.R.B. 155; W. H. Arthur Company, 115 N.L.R.B. 183.

6. Bakery and Pastry Drivers & Helpers Local 802 of International Brotherhood of Teamsters Local v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178; National Labor Relations Board v. Service Trade Chauffeurs, etc., 2 Cir., 191 F.2d 65.

7. National Labor Relations Act, Section 8 (b), Subsection (4) (A) and (B).

Where, however, employees of the primary employer spend part of their work day at the common situs and part at the plant of the primary employer, confusion in the cases arises.[8] It is this confusion which the Board has sought to resolve by mechanical application of its principle based on the availability of employees at the premises of the primary employer.

This court rejects the Board's contention that where employees of the primary employer may be reached at its premises, picketing at the premises of the secondary employer is a per se violation of the Act. Sales Drivers, etc. v. National Labor Relations Board, supra; National Labor Relations Board v. General Drivers, etc., supra. Under the First and Fourteenth Amendments to the Constitution, both sides to a labor dispute, or any other dispute, have a right freely to publicize that dispute and lawfully to picket wherever they feel such picketing may be effective. Garner v. Teamsters Union Local 776, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228; American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855. Picketing, like freedom of speech, is subject to restraint only by a proper exercise of sovereign police power or positive law. Allen-Bradley Local 1111 v. Wisconsin Employment Relations Board, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154; Milk Wagon Drivers Union of Chicago Local 753 v. Meadowmoor Dairies, Inc., 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836. In the case at bar, it is only where the picketing is performed at the premises of the secondary employer with the objective proscribed by the Act that it becomes unlawful. 29 U.S.C. § 158(b) (4) (A, B). If its purpose is to persuade people as to the righteousness of the cause of the pickets, it is legally unobjectionable. However, if its purpose is to create work stoppages at the premises of the secondary employer, in order to force that employer to cease doing business with the primary employer, then it comes within the prohibition of the Act.

In the case at bar, the union picketed secondary employers whenever Jahncke trucks were on the construction sites. Such picketing resulted in some work stoppages. The purpose of the picketing could not have been to publicize the strike to the Jahncke truck drivers because those truck drivers crossed the picket lines at various Jahncke plants ten to twelve times each day. Moreover, the business agent of Local 406 requested contractors to cease using Jahncke concrete and when the request went unheeded, more work stoppages followed. All but one of the contractors supplied with concrete by Jahncke eventually stopped using Jahncke concrete. These facts persuade this court that there is reasonable cause to believe that the objective of the picketing in suit was to force the secondary employers, through the creation of work stoppages at their construction sites, to cease doing business with the primary employer.

It may well be, as respondents contend, that these facts do not demonstrate a violation of Subsection (4) (A) and (B) of Section 8(b) of the Act. But it is not necessary for this court to make that determination. Since the facts here clearly demonstrate that there is reasonable cause to believe that a violation of the Act may have been committed, it is the duty of this court to maintain the status quo by enjoining the questioned activity until its legality can be definitively passed on by the exercise of the expertise of the National Labor Relations Board. It is for the Board to determine, after a full hearing, whether the objectives of the union's secondary activity are illegal under the Act. This

---

8. See National Labor Relations Board v. Truck Drivers & Helpers, etc., 111 N.L.R.B. 483, enforced 5 Cir., 228 F.2d 791; Washington Coca-Cola Bottling Works, Inc., v. National Labor Relations Board, supra. Compare Sales Drivers, etc. v. National Labor Relations Board, supra; National Labor Relations Board v. General Drivers, etc., supra.

court's statutory authority is exhausted when it finds, as it does, that on the showing made here, the evidence points in the direction of illegality.

Decree for petitioner.